**STATE, Plaintiff-Appellee, v. BARHORST, Defendant-Appellant.**

Ohio Appeals, Tenth District, Franklin County.

No. 5815.    Decided May 13, 1958.

Russell Leach, City Atty., Bernard T. Chupka, City Pros., Joseph M. Clifford. Asst. City Pros., Columbus, for plaintiff-appellee.

Helen A. Witherspoon, Columbus, for defendant-appellant.

## OPINION

By BRYANT, J.

Philipp H. Barhorst, defendant-appellant herein, was tried and found guilty of practicing optometry without a license contrary to §4725.02 R. C. The Judge of Columbus Municipal Court before whom the case was heard after Barhorst's conviction, imposed a fine of $200 and costs. Barhorst has appealed on questions of law.

The affidavit in part charges that "* * * Phillipp H. Barharst on or about the 5 day of June, A. D. 1957, at the City of City of Columbus, County of Franklin, and State of Ohio, did unlawfully engage in the practice of optometry; or held himself out as a practitioner of optometry without having a license lawfully issued by the State Board of Optometry contrary to statute, etc."

We note in passing that the rule against pleading in the alternative was not observed in this case and that the affidavit actually charges two violations in the alternative. The better practice is to use two affidavits or separately state and number two offenses in a single affidavit, in cases where it is necessary or proper to charge two offenses. However, our attention has not been called to a specific objection on this ground and it would appear that such objection is waived.

The prosecution appears to have proceeded on the theory that at least they had charged Barhorst with engaging in the practice of optometry without a license.

It was admitted by all concerned that Barhorst fully qualified under the law as first enacted in 1919 and that up until the year 1932 he was at all times in good standing. The prosecution claimed and attempted to prove that events occurring in 1932 and 1933 resulted in an irrevocable loss of license by Barhorst and that thereafter he could do nothing whatsoever to get himself in good standing.

Barhorst on the other hand took sharp issue with the claims of the prosecution. Failure to pay the annual renewal fee, originally $2 per year, later raised to $5 per year and still later to $10 a year, is the only transgression charged against Barhorst.

It was the prosecution's theory that this amount was due and payable on January 1 of each year including 1932, that Barhorst had not paid it on April 25, 1932, on which date it apparently was the claim of the prosecution that some sort of notice was sent to Barhorst informing him for the first time of his delinquency and, without further ceremony, informing him his license was revoked and giving him sixty days in which to apply for and obtain a restoration of his license. A review of the applicable statutes is necessary.

In the first place, Section 10 of the original act (108 Ohio Laws, Part I, P. 73 at P. 77) provided that failure to pay a renewal registration fee might be made the grounds for revoking a certificate, but forbade such revocation until the giving of a sixty day notice. This section provided in part as follows:

"In case of neglect to pay the renewal registration fee herein specified, the board may revoke such certificate and the holder thereof may be re-instated by complying with the conditions specified in this act. But no certificate or permit shall be revoked without giving sixty days' notice to the delinquent, who, within such period shall have the right of renewal of such certificate on payment of the renewal fee with a penalty of five dollars provided that retirement from practice for a period not exceeding five years shall not deprive the holder of said certificate of the right to renew his certificate on the payment of all lapsed fees."

This section was amended in 110 Ohio Laws, P. 20, but the language above quoted was unchanged and remained so until 1949. Hence, it was that the exhibit offered by the prosecution, being an unsigned carbon copy of a letter purportedly signed by the then secretary of the Board of Optometry to Barhorst, informing him that his license was revoked and giving him sixty days in which to take steps to reinstate it or be forever barred from the practice of optometry, violated the law as then in force. Sec. 1295-24 GC, being the fourth section of the original act and as amended in 110 Ohio Laws, P. 20, contained this language:

"* * * provided, however, that it shall require the concurrence of a majority of the members of the Board to grant or to revoke a license."

Inasmuch as the Board was composed of five members, the section above referred to required at least three members present to constitute a quorum and further required the vote of at least three members to revoke a license. There is no showing anywhere either that the Board met and considered the matter or that a quorum was present or that three members voted to revoke Barhorst's license. This, of course, is a fatal defect in the record.

Furthermore, §1295-31 GC, originally enacted in 1919, amended in 1923 and again in 112 Ohio Laws 227, made a specific provision that in case any charges of any sort were preferred against the holder of a certificate that the defendant should be furnished with a copy of the complaint and have a hearing before the Board with legal counsel present, if desired, and the right to confront and cross-examine witnesses against him and produce witnesses on his own behalf. Said §1295-31 GC, provides in part as follows:

"Any person who is the holder of a certificate of licensure * * * against whom is preferred any charges, shall be furnished by the board with a copy of the complaint and shall have a hearing before the board, at which hearing he may be represented by counsel. At such hearing witnesses may be examined for and against the accused respecting the said charges, which examination shall be conducted in the manner usually followed in the taking of testimony before commissions in this state."

Furthermore, section seven of the original act, being §1295-27 GC, remained in the form in which originally enacted until 1949.

That same provision in almost identical language remains in the law today and is found in §4725.07 R. C. Hence, it is that there was a complete failure of evidence to show there was a notice and a sixty

day waiting period given to Barhorst or that thereafter proceedings were begun against him before the Board with a quorum present, a copy furnished him, a hearing conducted and a finding of guilty and a revocation by the Board. On the contrary, for all that appears in the record to inform us as to what took place, there was no notice, no waiting period, no charge preferred or a hearing had, or evidence received or a determination of guilt, but simply a notice that his certificate of licensure was revoked. But that is not all.

Barhorst claims he attempted to pay each annual renewal fee as it was due that the Board of Optometry failed and still fails to comply with the law by maintaining an office in Columbus, where the permanent records of the Board are open during business hours for public inspection, and that he only gave up tendering payments after tracking down the secretary in various cities in Ohio and having his money returned to him accompanied by a statement that it was too late, that his license was revoked and that nothing could be done about it.

We have examined the Bill of Exceptions in this case with care. The state's case is based principally on the testimony of one Arthur H. Cole. In the transcript of the original papers from the Municipal Court there appears a letter signed by A. H. Cole, who adds the word, "Inspector," after his signature, while the printed letterhead at the top is as follows:

"State Board of Optometry
Arthur H. Cole
Exec. Secy.—Inspector
12839 Lorain Ave.
Cleveland 11, Ohio"

Mr. Cole's testimony is to the effect that he resides in Bay Village, Ohio, that he is Executive Secretary Inspector of State Board of Optometry and that he has in his custody all of the records of the said Board.

In view of the printed letterhead above referred to indicating that the office of the Board and of Mr. Cole is located at 12839 Lorain Ave., Cleveland 11, Ohio. The testimony by Mr. Cole (Bill of Exceptions, Page 4, Questions 3 and 4) is pertinent:

"Q3. Mr. Cole, what is your occupation? A. I'm Executive Secretary Inspector for the Ohio State Board of Optometry."

"Q4. And in your capacity, do you have access to and custody of records pertaining to optometrists? A. Yes, sir. I have in my custody and have charge of all of the records relating to the licensing and renewal of licenses in the State of Ohio." (Emphasis added.)

Upon cross-examination of Mr. Cole, he appears to have had great difficulty in answering the question as to where the office of the Board of Optometry is located. At one point he said there were several offices— one in Columbus, apparently a private establishment maintained under the name of a Dr. Welch, another in Marietta, where the secretary resides, and that of Mr. Cole, whose office is in Cleveland. From a consideration of the entire testimony, it would appear that the so-called Columbus office bears no mark or identification that it is the office of

the Ohio Optometry Board. Upon being pressed further as to how anyone could locate "such an office," Cole gave this illuminating reply (Bill of Exceptions, P. 17):

"Q80. Would you state that anyone attempting to contact such an office could readily do so? A. May I answer that in my own way? I don't know how else to answer it. The only two places that I know it could be directly contacted through are the Attorney General's office and the Secretary of State's office which has been understood to be sufficient. The question has been raised on numerous occasions. We understand that we are on correct legal ground on that basis. Now, that's all I can answer." (Emphasis added.)

It is quite understandable that the question "has been raised on numerous occasions" and it would appear that the laws have been disregarded. The original act creating this Board provided in clear and unmistakable terms that its office should be in the City of Columbus. Section 10 of said act, which became §1295-30 GC, provided in part as follows:

"The board shall * * * have an office at Columbus in this state. * * * where all its permanent records shall be kept, which records shall be open to public inspection."

The language above quoted is followed by a specific grant of authority to the Board of Optometry "to make requisition upon the proper state officials for office rooms and supplies, including stationery and furniture."

This was no accident on the part of the General Assembly for it was simply carrying out a constitutional mandate when it required that the office of this public agency be located at the seat of State Government in Columbus. Article XV, Section 1, Ohio Constitution, provides:

"Columbus shall be the seat of government until otherwise directed by law."

Similar provisions are made with respect to every one of the state departments included in the Executive Branch of Government. See §121.15 R. C., providing in part as follows:

"Each department shall maintain a central office in Columbus. * * *"

The state officials to whom the Board was directed to make application to obtain its office space in Columbus was the Department of Public Works.

Referring to the provisions of §123.02 R. C., we find the following power granted to assign office space:

"The department of public works shall have the supervision and control of the statehouse and heating plant therein, the fixing and placing of all departments and offices of the state therein, and full control and supervision of fixing and placing all departments and offices in offices, buildings, and rooms outside of the statehouse when they cannot be placed therein, * * *." (Emphasis added.)

It would seem eminently clear that the Board not only was empowered but was directed to apply for and obtain headquarters in Columbus either in the State House or in offices, building or rooms outside the State House selected and provided by the Department of Public

Works and that failure to do so, coupled with a complete disregard of the law by locating the office elsewhere, amounts to the violation of vital and mandatory provisions of the very law which brought the State Board of Optometry into existence.

From 1920 to the present time, the optometry law has without exception contained the specific and mandatory requirement as to a Columbus office. At this time, it may be found in §4725.07 R. C., which provides in part as follows:

"The state board of optometry shall * * * have an office at Columbus, * * * where all permanent records shall be kept. The board may make requisition upon the proper state officials for office rooms and supplies * * *."

"The records of the board shall be open to public inspection at all reasonable times. * * *."

Barhorst claims that in 1932 and thereafter he was unable to find the Columbus or other office to which he should pay his fees. Some support is given to his testimony by at least one State's exhibit. Plaintiff's Exhibit No. 2—an envelope and a letter, apparently was mailed by Barhorst in 1933, and addressed to the State Board of Optometry, Clark Sloan, Secretary, 405 Schofield Building, Cleveland, Ohio. Someone, perhaps in Cleveland, crossed out Sloan's name and the balance of the Cleveland address thereon and wrote in Dr. W. J. Briggs, Secretary, Shelby, Ohio. The letter enclosed in this envelope makes reference to a money order for $5 for the annual renewal fee. The said letter was dated August 6, 1933 (Bill of Exceptions, P. 9, Q. 33), and appears to have elicited a reply two months and five days thereafter according to plaintiff's Exhibit No. 3, which is apparently an unsigned office copy of a letter written by the same W. J. Briggs, Secretary, to Barhorst in Columbus.

Briggs' so-called letter stated that the money order was returned to Barhorst for the reason that "the revocation of your license to practice optometry became finally effective on June 25, 1932." (Bill of Exceptions. Plaintiff's Exhibit No. 3.) This was said to be due to Barhorst's failure to comply with §1295-30 GC as then in effect. (See 108 Ohio Laws, Part 1, P 73, at P. 77, H. B. No. 240, Sec. 10, as amended in 110 Ohio Laws, P. 20.)

We shall not repeat the comments heretofore made as to the provisions and content of said former §1295-30 GC, except to say that many changes were made in 1949 (See 123 Ohio Laws, P. 164), and that the law in effect today, as found in §4725.10 R. C., is much different from that in force prior to 1949.

For example, the section last named today provides that the failure to pay the annual renewal registration fee in advance prior to March 1, each year, "shall ipso facto work a forfeiture of his license," with provisions for a thirty day written notice prior to said date.

Even so. In view of the present day form and requirements of §4725.04 R. C., final sentence, as to Board action, it is possible some Board action would be required. The said final sentence reads as follows:

"Concurrence of a majority of the members of the board is required to grant or to revoke a license."

But in 1932 there was no such "ipso facto" provision in the law, which further points up the failure to observe the law in 1932.

But it was the law as in effect in 1932, not today, to which we must look in determining Barhorst's claim. One section we must consider is §1295-24 GC (as amended 110 Ohio Laws, P. 20), and in effect in 1932 which provided in part as follows:

"A majority of the board shall constitute a quorum, * * * provided, however, that it shall require the concurrence of a majority of the members of the board to grant or to revoke a license." (Emphasis added.)

The Board of Optometry at the time of its creation was composed of five members (§1295-23 GC), and today it is composed of five members (§4725.03 R. C.). Hence, it has always required the presence of not less than three members of the Board at any meeting to transact any business at all. It is also quite clear that no action of the said Board may be taken at all except at a regular meeting with a quorum present and that three or more votes are required to grant or revoke a license.

The record is completely silent and fails utterly to disclose whether or not the Board ever had a meeting at which the case of Barhorst was considered, and if it did have such a meeting, whether or not the required quorum of three duly appointed and qualified members were present, and if so, whether or not three or more voted to revoke Barhorst's certificate of licensure. The record is further absolutely silent with reference to any notice whatever required to be given to Barhorst followed by a sixty day period in which he would be permitted to pay the fee or whether he was served with written charges and given a legal hearing. On the contrary, it appears that first notice given to Barhorst was that his certificate was revoked with apparent information being given to him the following year that he had lost his license and that there was no way whatever for him to reinstate it.

It appears to us that this violates the clear mandatory provisions of the statutes in force at the time. In 1932 Barhorst had been engaged in the practice of optometry with the sanction and approval of the State of Ohio for approximately twelve years. It was not claimed then or now that he broke any law or regulation or that he failed in any particular except that he did not pay the $5 renewal fee on the prescribed date.

As this was a criminal case, the presumption of innocence was in the case. Barhorst claims he made repeated efforts to locate the oft moving board. He further says he repeatedly tried to pay the required fee. It was a legal requirement that an office be maintained at the seat of Government by this Board where all of its records be kept open for public inspection at all reasonable times, and that clear requirement is not met by having such office located in Cleveland, Shelby, Marietta or any of the other cities or villages in the State of Ohio.

Barhorst testified that when he could not locate the said Board in Columbus in 1932, he hired an attorney to try to locate them, and it would appear that Barhorst exerted diligent efforts to locate it. It also appears that the Board itself neglected to observe the law to the manifest prejudice of Barhorst.

The first assignment of error made by defendant-appellant was that the judgment and verdict were against the weight of the evidence. We are of the opinion that this assignment of error is well taken for the reason that, in our opinion, there was a failure to show by the necessary quantum of evidence that Barhorst's certificate ever was revoked in compliance with statute.

The second assignment of error, that the verdict was contrary to law, and the fourth assignment of error, that the State failed to prove beyond a reasonable doubt that Barhorst practiced optometry without a valid license, likewise must be sustained for the reasons above set forth.

This leaves the third assignment of error that the State failed to prove that Barhorst was engaged in the practice of optometry. When the testimony of the entire Bill of Exceptions is viewed together, it would appear that the inspector appeared to be bent and determined to bring about a violation of law. This situation is somewhat eased in light of our holding that Barhorst's certificate had not in fact been revoked and was in full force and effect.

Barhorst at no time asked for or received any money for his services nor was there any agreement to pay any sum whatsoever. Barhorst stated he did not like the appearance of the inspector and had no intention of fitting him with glasses and in fact sent him away at the time of his first visit. In view of our holding with reference to Barhorst's right to practice optometry, there will be no useful purpose served by further discussion of this assignment of error.

For the reasons above set forth the judgment of conviction and the sentence of the court below are reversed, vacated and set aside and the cause remanded to the court below for further proceedings in accordance with law.

PETREE, PJ, MILLER, J, concur.